LULIT MULUGETA, )
)
)
*Plaintiff,* )        Civil No. 1:17-cv-649
)        Hon. Liam O'Grady
v. )
)
SAMUEL TAFESSE ADEMACHEW, )
)
*Defendant.* )
)
)

## MEMORANDUM OPINION

This matter comes before the Court following a two-day bench trial. The parties

submitted pre-trial briefs and oppositions thereto. As such, the claims and counterclaims in this

case are now ripe for disposition.

For the reasons that follow and for good cause shown, the Court finds in favor of Plaintiff

Lulit Mulugeta and against Defendant Samuel Tafesse Ademachew on all claims and

counterclaims in this case. Plaintiff Mulugeta will be awarded relief as described below.

## I. INTRODUCTION

Plaintiff Lulit Mulugeta and Defendant Samuel Tafesse Ademachew are Ethiopian

natives who immigrated to the United States and became United States citizens. After the parties

became romantically involved, Ademachew convinced Mulugeta to move to Ethiopia where he

operates his businesses and, as one of the richest men in the county, is well-connected. Mulugeta

moved to Ethiopia, and the parties created a company called Salit Academy PLC to form and run

a school on one of Ademachew's properties to provide Mulugeta with a source of income.

Ademachew did almost everything to form Salit Academy PLC and create and operate the

school, including providing the funds; Mulugeta's role was largely limited to providing her signature when necessary.

Shortly after Mulugeta moved to Ethiopia, she became pregnant with Ademachew's son. She also quickly began to fear for her safety after a series of incidents involving Ademachew's wife. As a result, the parties agreed that Mulugeta should return to the United States. To give Mulugeta money to care for their son, start a business in the United States, and relieve her of any remaining obligations in Ethiopia, the parties entered into a contract to dissolve Salit Academy PLC and sell the school to Ademachew.

After the parties' romantic relationship soured, however, Ademachew failed to make the scheduled payments for the school to Mulugeta as required by the contract. Mulugeta sued Ademachew for breach of contract in this Court, and Ademachew countersued for breach of contract, unjust enrichment, fraudulent conveyance, and alter ego liability. Ademachew also sued Salit Academy PLC in Ethiopia and obtained judgments that the contract was a mere draft.

The Court declined to terminate this case in light of the Ethiopian judgments at the motion to dismiss and summary judgment stages. The Court then held a two-day bench trial to evaluate the parties' respective claims and determine whether the Ethiopian judgments should be recognized in evaluating those claims. At trial, the Court heard testimony from Plaintiff Lulit Mulugeta and Mr. Alemayehu Mengesha, Mulugeta's purported expert on corruption in the Ethiopian judiciary. Ademachew did not appear at either day of the bench trial, despite being on Mulugeta's witness list, and his counsel did not call any witnesses. As the parties had already submitted pre-trial briefs, this case is now ripe for a decision.

## II. FINDINGS OF FACT

### A. The Parties' Relationship with Each Other and the Formation of Salit Academy.

As noted above, both Mulugeta and Ademachew are Ethiopian natives who relocated to the United States, became United States citizens, and renounced their Ethiopian citizenship.[1] Ademachew is a billionaire and has been represented to be the second wealthiest man in Ethiopia. Although he is now domiciled in Virginia, Ademachew continues to visit Ethiopia frequently to maintain his prominent construction business and has remained well connected with top officials in the Ethiopian government. Mulugeta immigrated to the United States in 1992 after graduating high school and obtained a bachelor's degree in business administration with a concentration in finance. At the time the parties met, Mulugeta was working at Boeing in Seattle.

Ademachew first saw Mulugeta at a New Year's Eve function in 2008. After seeing Mulugeta at the function, Ademachew began pursuing a romantic relationship with her. Mulugeta was married and was not interested in becoming romantically involved with Ademachew. Ademachew, who was also married, nevertheless kept pursuing a romantic relationship with her. The parties eventually met in person for the time in August 2009 while Mulugeta was visiting a friend in Las Vegas, Nevada. At the time of that meeting, Mulugeta was separated from her husband and living in Seattle, while Ademachew was still married to his wife and living in Virginia.

During that initial in-person meeting in Las Vegas, Ademachew finally convinced Mulugeta to begin a romantic relationship with him. Ademachew never promised Mulugeta that he would divorce his wife, but told Mulugeta that he had a "sisterly relationship" with his wife

---

[1] Ethiopia does not allow for dual citizenship.

while "it was love at first sight" with Mulugeta. He told Mulugeta that in five years he would be able to "figure something out," and gave her what became the first promise ring of many throughout the course or their relationship.

Ademachew also told Mulugeta that he wanted her to move closer to him. Although Ademachew lived in Virginia and had become a United States citizen, he remained a well-known and well-connected real estate and construction mogul in Ethiopia. He told Mulugeta that businesses are profitable in Ethiopia, and that he would open a school for her in Ethiopia and make her a multi-millionaire. At first, Mulugeta was hesitant to move to Ethiopia to be with Ademachew because her life and career were in Seattle. She also had never thought about opening a school before and did not have any special training in education. Eventually, however, Ademachew convinced her to move to Ethiopia for him.

Before Mulugeta left Seattle, she purchased a home in Maryland to maintain her credit through mortgage payments. She purchased the home in Maryland instead of Seattle because Ademachew insisted that her United States home be close to his home in Virginia.

Mulugeta officially moved to Ethiopia in March 2010. Ademachew then took the lead in establishing a school for her. He chose one of his developed properties to be the location of the school, told Mulugeta everything she needed to do to establish Salit Academy PLC,[2] and had "expediters" help speed up what would have otherwise been a slow process. Mulugeta's role in creating Salit Academy was largely limited to accompanying Ademachew to meetings to sign documents. Ademachew paid for everything for Salit Academy PLC and the school, including the price to rent and later purchase the school's land from his company for 4.2 million Ethiopian

---

[2] "Salit" was chosen as the name of the company and school because it was a combination of Ademachew's first name, Samuel, and Mulugeta's first name, Lulit.

birr, the purchase price he set.[3] Ademachew also drafted the Articles of Incorporation for Salit Academy PLC, which Mulugeta owns with her mother because two owners are necessary to form a PLC.[4]

Soon after moving to Ethiopia, Mulugeta became pregnant with Ademachew's son. She also began to feel unsafe after Ademachew's wife came to the house Ademachew was renting for Mulugeta and later left a letter at the house telling Mulugeta "you should go back to where you came from, or you're going to suffer dire consequences." As a result, Mulugeta resigned as the general manager of Salit Academy and moved back to Maryland in September 2010.

Salit Academy had not yet opened before Mulugeta left Ethiopia. After Mulugeta left and resigned as general manager, her brother Tatek became the school's general manager at Ademachew's suggestion. Mulugeta remained the owner of the school, but was never involved in running the school and was not given updates about the school even when she asked.

In 2014, Mulugeta decided to end her romantic relationship with Ademachew because she "felt like he wasn't the person that [she] thought he was going to be," although she strived to maintain a cordial, platonic relationship for the sake of their son. Sometime in 2014 or 2015, the parties agreed to close Salit Academy. Ademachew told Mulugeta the school was never profitable, and he was tired of infusing money into it. Mulugeta also had no interest in moving back to Ethiopia to run the school and wanted to reestablish herself in the United States. The parties therefore agreed to sell the school and have Mulugeta use the money from the sale to run a business in the United States.

---

[3] Ademachew gave Salit Academy PLC the funds, and then Salit Academy PLC paid Ademachew's company Sunshine Construction.
[4] Ademachew suggested that Mulugeta's mother be the second owner. Mulugeta owns eighty percent of the shares while her mother owns the remaining twenty percent.

Ademachew found a buyer for the school and assured Mulugeta that the sale would go through and that he would cover the sale price if the buyer did not pay it in full. Based on Ademachew's representations, Mulugeta flew to Ethiopia to complete the necessary paperwork to complete the sale. Upon her arrival in Ethiopia, however, Ademachew informed Mulugeta that the buyer had changed his mind.

A few weeks later, the parties agreed that Ademachew would buy the school from Salit Academy PLC and pay Mulugeta the sale price personally in United States dollars, which Mulugeta would then use to establish a business in the United States. The parties later formalized their oral agreement in the written contract that is the subject of this litigation.

### B. The Terms of the Contract.

The contract was drafted in Ethiopia on June 27, 2015 and signed on August 4, 2015.[5] Although the contract was written in Amharic, the Court has been provided with a certified English translation.

The contract provides that Salit Academy PLC will sell the school to Ademachew for one million dollars. Contract ¶¶ 2, 4. Ademachew suggested the $1 million price and although Mulugeta was told she could get more for the school, she agreed to that amount because it was a good round number, the parties had agreed the money would go directly to Mulugeta, and the parties contracted that Mulugeta would not be responsible for any other costs.[6]

---

[5] The delay in signing the contract was due to Ademachew's travel to Dubai after the contract was drafted. The contract was signed in a coffee shop in Addis Ababa with Mulugeta, Mulugeta's aunt, Mulugeta's mother, Ademachew, and Ademachew's lawyer present. Mulugeta's mother had previously given Mulugeta full power of attorney to act on her behalf with respect to Salit Academy PLC.

[6] Mulugeta understood that under the contract, Ademachew assumed all costs going forward including her attorneys' fees in any litigation over the contract.

The contract provides that Ademachew was to pay the $1 million in three installments. *Id.* ¶ 4. The parties further agreed that the $1 million would be paid to Mulugeta directly to help her reestablish herself and start a business in the United States.

The first scheduled payment installment was for $435,000. *Id.* at ¶ 4.1. Half of the first installment was due on July 22, 2015, and the second half was due on September 15, 2015. *Id.* The contract specifies that these payments were to "be deposited in Ms. Lulit Mulugeta['s] name at her account in America with the official exchange rate." *Id.*

The second scheduled payment installment of $217,500 was to be paid in full on October 25, 2015 by depositing that sum in "Ms. Lulit Mulugeta's US account with an official exchange rate." *Id.* at ¶ 4.2.

The third payment installment of $347,500 was to be exchanged in person "after [Salit Academy PLC] gets a clearance and gets a sells [sic]" – i.e., title transfer[7] – "contract ready to be signed, from the office of documents registration and approval, and informs [Ademachew], before November 30 2015 [sic], and Ms. Lulit Mulugeta signs within sixty days." *Id.* at ¶ 4.3. Although paragraph 4.3 stated that Salit Academy PLC was to obtain the clearance and title transfer contract, Mulugeta understood that Ademachew had agreed to take on these responsibilities in paragraph 5.2 because Mulugeta was never really involved with the school and needed to return to the United States to care for their son, while Ademachew was often in Ethiopia and had experience selling property in Ethiopia. Consistent with Mulugeta's understanding, paragraph 5.2 states:

> The building on this contract is sold because it was decided to dissolve Salit Academy Plc. Hence we have agreed that it is the responsibility of the buyer [Ademachew], either himself or through a representative, to follow up all the

---

[7] Mulugeta testified that "sells contract" is an error in translation and should read "title transfer contract." When paragraph 4.3 is read in conjunction with the rest of the contract, the Court agrees that "sells contract" refers to a title transfer contract.

responsibilities of the hired manager of the association of all the tasks regarding dissolving the association and getting a clearance, checking the right documents have been given to the concerned government offices, [and ensuring] the account books of the association have been closed.

*Id.* ¶ 5.2.[8]

Ademachew also agreed to assume the responsibility of providing the tax clearance forms for the sale of the school, *id.* at ¶ 3.3, and "cover all expenses . . . related to name transfer," including taxes, *id.* at ¶ 5.1. Additionally, consistent with both Mulugeta's understanding and Ademachew's representations of Ethiopian law governing the transfer of property title, the contract's final paragraph regarding the parties' obligations specifies that the title transfer contract will be "presented to the Office of Document Registration and Approval and signed" to effectuate the name transfer. *Id.* at ¶ 5.4.[9]

Other than returning to Ethiopia to ultimately sign the title transfer paperwork, the only other obligation Mulugeta retained on behalf of Salit Academy PLC was to obtain a dissolution paper for the corporation from the Document Authentication and Registration Office ("DARO") within "six month ( 180) days of the signing of this contract." *See id.* at ¶ 3.1 (quoted without alterations).

In the meantime, the parties agreed that Ademachew would be given immediate control of the school and assume all expenses and responsibilities for the property. *Id* at ¶¶ 5.3–5.4.

---

[8] It is also consistent with the parties' course of conduct throughout their relationship that Ademachew would be responsible for obtaining all necessary documents.

[9] Although the language in paragraph 5.4 is not a model of clarity and refers only to "*the* contract," it is clear that "the contract" is referencing a subsequent title transfer contract based on (a) the use of "*this* contract" throughout the rest of the agreement to refer to the purchase agreement before the Court, (b) the language in paragraph 4.3 referencing the creation of a separate "sells contract," which Mulugeta testified meant a title transfer contract, (c) paragraph 5.4's inclusion in the "Covering costs and name transfer" section of the contract, and (d) paragraph 2's declaration that the building was "to be transferred through sell."

In the event Ademachew defaulted on any of his obligations under the contract, he agreed to pay a $100,000 penalty "according to the Civil Code No. 1889." *Id.* at ¶ 4.4. The contract does not contain any other provisions that would apply in the event of a breach.

The contract also does not contain a choice-of-law clause governing the interpretation and enforcement of the contract. There is, however, a provision specifying that "all relevant proclamations of the civil code law will prevail in relation to the building [Salit Academy PLC] is transferring to [Ademachew]." *Id.* at ¶ 6.[10]

Mulugeta, as the designated officer and deputy manager of Salit Academy PLC, and Ademachew signed the contract on August 4, 2015, certifying their agreement "that this contract is binding from the day the contracting parties signed on it" and that they "have agreed, with all willingness and desire, to implement the responsibilities and tasks implicated within this contract." *Id.* at ¶¶ 1, 7.

## C.     Events Following the Formation of the Contract.

While in Ethiopia to sign the contract, Mulugeta completed the only step the parties agreed she was required to take until she signed the title transfer document: obtain a dissolution certification from DARO.[11] Mulugeta also transferred control of the school to Ademachew, with her brother serving as general manager.[12]

Ademachew failed to pay the first installment of the contract price as required. The contract required the first payment of $435,000 to be paid in half by July 22, 2015, and in full by

---

[10] In particular, the parties contemplated that the actual title transfer document would be signed at DARO as required by Ethiopian law. *Id.* at ¶ 5.4.

[11] Although Mulugeta did not offer the dissolution certification into evidence, Mulugeta's testimony on this point appeared credible and was not contradicted by Ademachew. The Court has also been informed that an English translation of the dissolution paper was produced in discovery. The original dissolution paper was not produced in discovery because Mulugeta and her attorneys believe that under Ethiopian law, if Ademachew had a copy of the original he could immediately arrange to transfer the property.

[12] Mulugeta was unsure if her brother had rights to access the school as of the date of the bench trial and testified that only Ademachew knows who currently has access to the property.

September 15, 2015. *Id.* at ¶ 4.2. Ademachew paid Mulugeta $99,955 on July 9, 2015,[13] Pl.'s Ex. 2, $235,000 on August 5, 2015, Pl.'s Ex. 3, and $100,000 on September 8, 2015, Pl.'s Ex. 4. Together, these three payments were $45 shy of the $435,000 Ademachew owed Mulugeta. Mulugeta was told the disparity was the result of wire transfer fees.[14]

Mulugeta never received any portion of the second installment of the contract price. Mulugeta repeatedly asked Ademachew about the payment, and he kept responding that he would get it done. At some point, however, Ademachew began making additional demands of Mulugeta before he would send her the second installment. For example, Ademachew asked Mulugeta to give him the Salit Academy PLC dissolution papers so he could sell the school and pay Mulugeta from the proceeds. Ademachew also asked for a new agreement that differed from the contract the parties had signed. Mulugeta refused to give Ademachew the dissolution papers before she received the second payment installment required by the contract because once she gave Ademachew the dissolution papers, she believed there would be no way to get the school back or the money she was owed.

After months of Ademachew also missing child support payments and threatening to reduce child support, Mulugeta sued Ademachew in Maryland for sole custody of their son and for court mandated child support. After the custody suit was filed, Ademachew told Mulugeta that he was "not doing anything anymore."

Mulugeta hoped that the parties' child support, child custody, and contract disputes could all be resolved in a single settlement. To that end, after Mulugeta received a legal notice from

---

[13] This first payment was made before the contract was signed.
[14] Mulugeta has never paid income tax on the roughly $435,000 she received from Ademachew. Mulugeta explained that she has not yet paid taxes because her accountant told her she did not need to file taxes yet given that the sale is not complete and there was ongoing litigation involving those payments.

Ademachew requesting that Mulugeta provide him with signed tax documents,[15] Mulugeta's

attorney in the Maryland case sent a letter to Ademachew with the following offer:

> Ms. Mulugeta has been awaiting payment since October 25, 2015 under the
> parties' contract, but Mr. Ademachew has recently voiced concerns about his
> ability to transfer the school to his name without Ms. Mulugeta's completion of
> documents that will help clear any clouds on title. We propose that Mr.
> Ademachew deposit the $565,000.00 owed to Ms. Mulugeta in an escrow account
> in Maryland. After the funds are deposited, Ms. Mulugeta will complete the
> documents required to clear title on the school so that Mr. Ademachew can
> transfer the school to his name. Ms. Mulugeta will provide the completed
> documents to Mr. Ademachew, after which the escrowed funds can be transferred
> to her.

Pl.'s Ex. 5. Ademachew did not accept Mulugeta's offer. [16]

Mulugeta believes that unless her contract with Ademachew is enforced, she will be

damaged. Mulugeta testified that she would not feel safe traveling to Ethiopia to try to sell the

property and, in any event, she believes Ademachew would interfere with any attempts she made

to sell the property. Mulugeta also testified that she cannot hire a real estate agent to sell the

property for her because when she attempted to do just that, the real estate agent was told to

leave and that the property was not for sale. As a result, when Ademachew refused to comply

with the contract or accept her settlement offer, Mulugeta filed this present lawsuit for breach of

contract.

After this lawsuit was filed, the parties discussed settling the case. During those

discussions, Ademachew told Mulugeta "I may not win, but I am going to exhaust you

financially litigating it." Ademachew also filed counterclaims alleging (1) breach of contract, (2)

unjust enrichment, (3) fraudulent conveyance, and (4) alter ego liability.

---

[15] Mulugeta testified that she had never been required to sign any tax documents in the past.
[16] In the Maryland child support case, Mulugeta eventually obtained a judgment that Ademachew was required to pay $10,000 a month in child support.

## D.   Ethiopian Litigation and Judgments.

Ademachew also initiated a breach of contract suit of his own in Ethiopia against Salit

Academy PLC. The Ethiopian lawsuit was purportedly filed on June 6, 2017, only two days

before this lawsuit was filed. [17] Dkt. 16-11. Upon receipt of Ademachew's "charge petition," the

Ethiopian court ordered Ademachew to serve Salit Academy PLC with the pressed charge,

ordered that Salit Academy PLC's written reply to the charge would be due August 9, 2017, and

scheduled a hearing for November 14, 2017. *See* Dkts. 16-11, 43-9.

On July 31, 2017, Ademachew wrote a letter to the Ethiopian Federal High Court. Dkt.

43-9 at 2. In that letter, Ademachew noted that although he had still not served Salit Academy

PLC with the pressed charge, he "needs the result of the litigation in this country for another

related lawsuit in [the] USA" and requested an expedited hearing to be scheduled in September

2017. *Id.* In response, the Ethiopian court contacted Salit Academy PLC on August 1, 2017, to

inform it that any reply to Ademachew's civil lawsuit would be due on September 29, 2017, and

a hearing would be held on October 9, 2017. Dkt. 43-9 at 3. When Mulugeta learned of the

Ethiopian lawsuit, she hired a lawyer for Salit Academy PLC. Mulugeta has paid for Salit

Academy PLC's lawyer from the money she has received renting her Ethiopian house, not from

any of the money she received from Ademachew pursuant to the contract at issue.

On January 2, 2018, the Federal High Court of Ethiopia found in favor of Ademachew

without hearing witnesses. Def.'s Ex. B; Dkt. 40-2. The Ethiopian court's judgment is

---

[17] The parties did not admit evidence during trial regarding the authenticity of the June 6, 2017, filing date listed on the Ethiopian "charge petition," although Mulugeta has previously challenged its authenticity. In particular, Mulugeta has noted that the United States Department of State verification form for the documents reflecting a June 6, 2017, filing date was dated March 28, 2017, well before the Ethiopian litigation was initiated according to the documents purportedly being verified. Dkt. 16-11. Mulugeta has also implied that given Ademachew's wealth and connections in Ethiopia, which is known to struggle with corruption, and Ademachew's contradictory sworn statements about the Ethiopian case, the date listed on the charging petition and Ethiopian court order cannot be trusted.

exceedingly difficult to understand, both because of the language used and the troubling

inconsistencies and contradictions it contains. The Ethiopian court appeared to recognize that

Ademachew was contractually required to effectuate the second payment installment *before* Salit

Academy PLC was required to execute a "Sales contract deed" at DARO. Def.'s Ex. B at 10–11.

Confusingly, however, the court then found that "both disputing parties were required to

discharge their contractual obligations specified herein concurrently with their activities without

waiting for each other to perform first" and that Salit Academy "is more at guilt" for the "failure

to execute the deed at DARO." *Id.* at 11, 15. Ultimately, the Ethiopian court held that the

contract "shall be regarded as a mere Building Sales Contract Draft [rather] than a formal

Building Sales Contractual Deed" because the contract had not been executed before a Notary

Public at DARO as is required for all contracts transferring ownership rights to immovable

property. *Id.* at 14. As a result, the Ethiopian court decided that Salit Academy PLC had to

reimburse Ademachew for the payments Mulugeta had already received and Ademachew had to

return the school to Mulugeta. *Id.* at 14, 15.

On February 2, 2018, Salit Academy appealed the Ethiopian Federal High Court's

decision. Def.'s Ex. C; Dkt. 40-3. Salit Academy argued that the lower Ethiopian court erred in

ignoring Ademachew's obligations that were contractual conditions precedent for executing a

deed at DARO that would transfer ownership of the property. Def.'s Ex. C at 4. In particular,

Salit Academy argued that "in a situation where the parties have not denied the existence of the

contract in dispute, and while more than 95% of the obligations therein have been fulfilled and

while the issue of signing the contract at the said office, as part of the process of transferring the

title deed in favor of the buyer, has been delayed by the default of the respondent and the

hindrances he has caused, the lower court's decision to relegate the contract to a mere draft

13

document, on the grounds of non-registration . . . sustains fundamental error of law." *Id.* at 6–7.

Salit Academy further argued that the lower court had denied Salit Academy's right to be heard.
*Id.* 4.[18]

On May 30, 2018, the Federal Supreme Court of Ethiopia affirmed the judgment of the

lower court. Def.'s Ex. D. The court summarized the arguments presented in objection to the

Ethiopian Federal High Court's ruling, but largely ignored most of Salit Academy PLC's

arguments and affirmed with fairly conclusory analysis.

Following the Ethiopian Supreme Court's appellate decision, Salit Academy PLC applied

for reconsideration of the decision by the Cassation Bench of the Ethiopian Judiciary (effectively

a petition for a writ of certiorari to the highest court). The Cassation Bench accepted the case for

review on January 28, 2019, before the second day of the bench trial in this case. Dkt. 82-1 at 3.

The Court has been informed that the Cassation Bench issued a decision on May 8, 2019, but has

not been provided with a reliable or complete translation of that decision to date.[19]

### III. CONCLUSIONS OF LAW

Before the Court are Mulugeta's breach of contract claim and Ademachew's four

counterclaims for breach of contract, unjust enrichment, fraudulent conveyance, and alter ego

liability. Before addressing the merits of these claims and counterclaims, the Court must first

determine (a) what effect, if any, the Ethiopian judgments have on the parties' respective claims,

---

[18] The appeal did not argue that the judgment was the result of bias or corruption because Mulugeta did not want to put Salit Academy PLC's lawyer's life at risk.

[19] On June 4, 2019, Ademachew moved to supplement the record with the Cassation Bench's decision. On June 19, 2019, the Court denied that motion after Plaintiff demonstrated that the proffered documents lacked adequate indicia of reliability as to their authenticity and translation accuracy. Dkt. 90. On July 2, 2019, at Ademachew's request, the Court clarified that its denial of the motion to supplement was without prejudice. Dkt. 92. The Cassation Bench's decision was purportedly rendered over three months ago and neither party has submitted a reliable translation of that decision to date. Further, for the reasons stated below in the Court's analysis addressing comity, the Court finds that receiving a translation of that decision will not alter its decision. As a result, the Court does not find good cause to further delay ruling on the issues raised in this lawsuit while awaiting a translation of the Cassation Bench's decision.

(b) whether the Court has jurisdiction to decide the breach of contract claims given that the immovable property at issue is in Ethiopia, and (c) what law should be applied in analyzing the contract.

## A.     The Court Declines to Recognize the Ethiopian Judgments.

Throughout this litigation, Ademachew has relied on the Ethiopian judgments to argue that there is no longer a contract to enforce or, alternatively, that the contract's essential purpose has been frustrated. Relatedly, Ademachew has also argued that this Court should defer to the Ethiopian courts' determinations regarding the enforceability of the contract because the Ethiopian courts are best positioned to analyze an Ethiopian contract written in Amharic and concerning the transfer of immovable property in Ethiopia. At the very least, Ademachew believes the Court should rely on the Ethiopian judgments as conclusive statements of how Ethiopian law applies to the contract at issue. Each of Ademachew's arguments rise or fall on a determination of whether the Ethiopian judgments at issue are entitled to recognition under the principles of international comity.

The test for whether United States courts should recognize or enforce foreign judgments under the principles of international comity was set forth by the Supreme Court in *Hilton v. Guyot*, 159 U.S. 133 (1895). In *Hilton*, the Supreme Court held that judgments by foreign courts should be recognized and given conclusive effect "where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice." *Id.* at 202–03. If any of these requirements are absent, the United States court need not recognize the foreign judgment. *See id.* For example, comity does not apply to a foreign judgment where there is evidence "to

show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment." *Id.*

Consistent with the Supreme Court's holding in *Hilton*, Virginia statutory law states that a court "shall not recognize a [final, conclusive, and enforceable] foreign judgment" which "grants or denies recovery of a sum of money" if "[t]he judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law." Va. Code Ann. §§ 8.01-465.13:2, 8.01-465.13:3(B)(1) (West 2014) (adopting the Uniform Foreign-Country Money Judgments Recognition Act). Similarly, Virginia statutory law also provides that a court "need not recognize a foreign-country judgment if" (a) "the judgment . . . is repugnant to the public policy of the Commonwealth or of the United States," (b) "[t]he judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the judgment," or (c) "[t]he specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." *Id.* at § 8.01-465.13:3(C)(3), (7), (8).

Virginia's statutory laws regarding comity are also consistent with the oft-cited Restatement (Third) of Foreign Relations Law § 482 (Am. Law Inst. 1987). Relevant here, the Third Restatement comments further explain that a foreign judgment is "not entitled to recognition or enforcement" where there is evidence that the foreign court, either generally or in the particular judgment specifically, "was dominated by the political branches of government or by an opposing litigant." *Id.* cmt. b. The comments to the Third Restatement also confirm that "[c]ourts will not recognize or enforce foreign judgments based on claims perceived to be contrary to fundamental notions of decency and justice." *Id.* cmt. f.

The recently issued and updated Restatement (Fourth) of Foreign Relations Law (Am. Law Inst. 2018) tracks the language in the Uniform Foreign-Country Money Judgments Recognition Act, adopted by Virginia, even more closely than the Third Restatement and adds further examples of foreign judgments that are not entitled to recognition. The Fourth Restatement explains that courts "will not" recognize the judgments of non-impartial "[c]ourts that systematically discriminate on the basis of factors such as nationality, race, sex, wealth, political affiliation, or other status." § 483 cmt. b. Similarly, "[a] pattern of ex parte contacts between the court and one side to the dispute," "similar one-sided interventions," or "[t]he selective use of conclusive presumptions . . . if enacted to affect the outcome of a particular proceeding," might all "demonstrate a lack of fundamental fairness" in the foreign proceedings "even in situations in which a court faithfully and disinterestedly applies the law." § 484 cmt. j. The Fourth Restatement also teaches that "[a] foreign judgment violates local public policy only if its recognition would tend clearly to injure public health, public morals, or public confidence in the administration of law, or would undermine settled expectations concerning individual rights, whether of personal liberty or private property." *Id.* at cmt. e.

Consistent with these authorities, "United States courts routinely deny comity to courts in countries where the judicial system is well-recognized to be corrupt and lacks impartiality." *Comm'ns Import Export S.A. v. Congo*, 2015 WL 13667748, at *2 (D.D.C. July 6, 2015). In *Commissions Import Export*, the court declined to recognize Congolese orders putting the plaintiff into liquidation because the orders "were the result of highly questionable, and perhaps even fraudulent, proceedings." *Id.* The court in *Bridgeway Corp. v. Citibank* similarly denied recognition to a Liberian judgment regarding a method of payment. 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 134 (2d Cir. 2000). The *Bridgeway* court found that "[t]he

Liberian judicial system simply did not provide for impartial tribunals" because the Liberian "justices and judges served at the will of the leaders of the warring factions, and judicial officers were subject to political and social influence." *Id.* Citing *Bridgeway*, the court in *In re Perry H. Koplik & Sons, Inc.* refused to recognize various Indonesian decisions – including decisions that a sale contract and letter of credit were void and non-enforceable – even though no corruption was proven in the decisions at issue because the State Department Report on Indonesia established that systematic corruption existed in the Indonesian judicial system. 357 B.R. 231, 239–44 (Bankr. S.D.N.Y. 2006). As a result, the *In re Perry* court held that a party was permitted to argue that the letter of credit declared null and void by the Indonesian court was in fact valid and enforceable. *Id.* at 244–45.

Similar to the argument rejected in *In re Perry*, Ademachew seeks to use the Ethiopian judgments in this case to prove that there is no longer a valid contract to enforce between Salit Academy PLC and Ademachew. Ademachew argues that recognizing that the contract's purpose has been frustrated by the Ethiopian judgments is different from recognizing the foreign judgments. As *In re Perry* makes clear, however, the Ethiopian courts' holdings that the contract is a draft only affect this case if the Ethiopian courts' decisions are entitled to recognition. For the reasons that follow, the Court finds that they are not.

As an initial matter, foreign judgments are entitled to recognition only where they are "final, conclusive, and enforceable." *E.g.*, Va. Code Ann. § 8.01-465.13:2(A)(2). The Court has not been provided with a copy of a final decision from the Ethiopian Cassation Bench, which accepted an appeal of the judgments Ademachew relied on at trial and throughout the case. For that reason alone, Ademachew has failed to demonstrate any conclusive effect of the Ethiopian judgments on the enforceability of the contract. However, because the Court has been informed

that the Cassation Bench affirmed the prior Ethiopian judgments, the Court will continue with the comity analysis to determine whether the judgments would be entitled to recognition and preclusive effect if they were final.

Although Mulugeta has consistently argued that the Ethiopian judgments are not entitled to recognition because the Ethiopian judiciary suffers from systematic corruption, the Court finds that there is not sufficient credible and compelling evidence in the record to support such a broad finding. At trial, Mulugeta offered Mr. Mengesha, an Ethiopian lawyer who practiced in Ethiopia from 1989 to 2006, as an expert on corruption in the Ethiopian judiciary. Yet, Mr. Mengesha has only been to Ethiopia once since 2006 and did not convince the Court that he has remained sufficiently abreast of developments in Ethiopian law and the Ethiopian judiciary to reliably offer an opinion as to whether the Ethiopian judiciary suffers from systematic corruption today. Mr. Mengesha also testified that while he knew some judges accepted bribes while he practiced law in Ethiopia, he was not aware of any judicial corruption in the over 7,000 criminal cases and roughly 325 civil cases he won before Ethiopian courts. The U.S. Department of State's report on Ethiopia also suggests that corruption in the Ethiopian judiciary may not be systematic, but rather case-specific: "There are allegations of executive branch interference in [the] judiciary if a case has political implications, but there is no evidence of interference on purely commercial disputes." U.S. Dep't of State, Bureau of Econ. & Bus. Affairs, Diplomacy in Action: 2017 Inv. Climate Statement on Ethiopia 6 (June 29, 2017) (hereinafter "Dep't of State Report") (available at Dkt. 43-5).[20] Thus, while there is evidence that certain types of Ethiopian judgments, such as those with political implications, may be suspect, there is not sufficient evidence before the

---

[20] Freedom House, an independent watchdog organization dedicated to the expansion of freedom and democracy around the world, similarly determined that the Ethiopian judiciary "is officially independent, but in practice it is subject to political interference, and judgments rarely deviate from government policy." Dkt. 43-3 (dated 2018).

Court to find that the Ethiopian judiciary suffers from systematic corruption depriving all of its judgments from eligibility for recognition.

The record before the Court is sufficient, however, to demonstrate that the particular judgments in this case were "rendered in circumstances that raise substantial doubt about the integrity of the rendering court[s] with respect to the judgment[s]." Va. Code Ann. § 8.01-465.13:3(C)(7). As previously noted, there is evidence that the Ethiopian judiciary is swayable if a case has political implications. Ademachew is one of the wealthiest men in Ethiopia, a prominent business man in Ethiopia, and knows all the top people in the Ethiopian government. Thus, although the Ethiopian case involved only an alleged breach of a million-dollar contract for a school building, Ademachew's wealth, close ties to the upper echelons of the government, and status as a well-known construction and real estate mogul gives the case a political dimension.

Indeed, the speed at which Ademachew was able to obtain judgments in his favor – particularly judgments with such contradictory statements and findings contrary to the basic underpinnings of any contractual law – strongly indicates that Ademachew's status influenced the Ethiopian judges. Mr. Mengesha testified that while civil cases took on average five to seven years to reach a verdict while he practiced in Ethiopia, if there was a special relationship between the judge and one of the parties, the Ethiopian court would speed up the case. Although Mr. Mengesha's knowledge is somewhat dated, it appears to remain accurate. The U.S. Department of State reported that cases in Ethiopia "can face extended scheduling delays" and "it takes on average 530 days to enforce contracts through the courts" in Ethiopia. Dep't of State Report at 7, 8. Yet, Ademachew's breach of contract case reached a judgment in only 210 days, completed appellate review in only 117 days, and was ruled on by the Cassation Bench only 100 days after

the Cassation Bench accepted jurisdiction. Stated differently, once the time spent between each of the different Ethiopian courts is subtracted, Ademachew's Ethiopian case reached a final judgment after proceeding through three separate courts in only 427 days. The "fast tracking" of the Ethiopian case after Ademachew put the Ethiopian courts on notice that he "needs the result of the litigation in [Ethiopia] for another related lawsuit in [the] USA" raises substantial doubt about the integrity of the judgments rendered.

Further, as noted above, the decisions themselves contain troubling inconsistencies and conclusory findings that further raise red flags about their integrity. The lower court recognized that Ademachew's second payment was due "without waiting" for the transfer deed to be signed at DARO, yet proceeded to contradictorily find that both parties were required to discharge their obligations "concurrently" despite the chronological dates tied to the completion of those duties and that Mulugeta was more at fault for not getting the transfer deed signed at DARO. Further, in declaring the contract a mere draft, the Ethiopian courts necessarily treated the contract as itself a deed that would transfer the property title despite the contract clearly contemplating that such a transfer would be completed in the future through a separate document after the parties took the steps outlined in the contract. In other words, the Ethiopian courts ignored, without explanation, the crucial distinction between an agreement for the sale of land and a document that purports to transfer title to the land. The Ethiopian courts' "conclusive presumptions" in these regards were necessary to the judgments rendered and "demonstrate a lack of fundamental fairness" in the courts' assessment of the contract.

In sum, the speed of the Ethiopian judgments and the concerning and contradictory analysis upon which they rest, when viewed in combination with the evidence about the Ethiopian judiciary and Ademachew's status and known influence in Ethiopia, convince the

21

Court that the Ethiopian judgments were "rendered in circumstances that raise substantial doubt about the integrity of the rendering court[s] with respect to the judgment[s]." As a result, the Court declines to recognize the Ethiopian judgments.

The Court also declines to recognize the Ethiopian judgments because they are "repugnant to the public policy of the Commonwealth or of the United States." The Ethiopian judgments declared a contract for the sale of property which was signed by both parties, expressly states that it is binding from the date of execution, and which prompted substantial performance by both parties, to be an unenforceable draft agreement. In this litigation over the same contract, Ademachew has failed to show that Ethiopian contract law is significantly different from Virginia contract law, under which such a contract is clearly no mere draft.[21] The Ethiopian judgments are therefore not entitled to recognition because they are contradictory to the basic underpinnings of common contractual law and clearly "undermine settled expectations concerning individual [contractual] rights."

The Court also does not find Ademachew's concern that failure to recognize the Ethiopian judgments would result in inconsistent judgments a compelling reason to recognize the Ethiopian judgments and give them conclusive effect. In *Hartford Fire Insurance Co. v. California*, the Supreme Court held that a true conflict between domestic and foreign law exists only where (a) compliance with one country's laws would require a party to act in violation of the laws of another country or (b) compliance with the laws of both countries is otherwise impossible. 509 U.S. 764, 799 (1993) (finding that the United States court should not have refrained from exercising jurisdiction on the grounds of international comity where a British court had already held that the defendants' conduct was lawful because the plaintiffs argued that

---

[21] *See infra* Parts III.C and III.D.ii.

defendants' conduct was contrary to the laws of the United States). Here, the foreign courts have held that the contract is unenforceable, and the plaintiff argues that the contract should be enforced. Thus, in both this case and *Hartford Fire*, a foreign court determined that a defendant is not bound by certain restraints on his conduct and a plaintiff in a domestic court argues to the contrary. The Supreme Court held that the United States court in *Hartford Fire* should resolve the dispute in that case on the merits notwithstanding the foreign judgment because there was no true conflict. The same is therefore true in this case as well.

Finally, it would violate public policy and the principles of fundamental fairness to allow Ademachew to avoid an unfavorable United States judgment by fast-tracking a similar case in a foreign court over which he appears to hold influence, as it would encourage parties to obtain corrupt judgments in foreign courts to avoid an unfavorable result in fair proceedings before a United States court. *See Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1068–69 (9th Cir. 2007) (refusing to recognize a foreign judgment where the "sole purpose" of the foreign action was to "evade the enforcement of an otherwise-valid" contract provision).[22]

For all these reasons, and for good cause shown, the Court declines to recognize the Ethiopian judgements proffered by Defendant Ademachew.[23]

**B.     The Court Has Jurisdiction to Rule on the Merits of Plaintiff's Breach of Contract Claim.**

Ademachew has also argued that the Court should dismiss this case because "the Court lacks jurisdiction over the *in rem* property and cannot order Salit Academy PLC – a non-party in

---

[22] While the Ethiopian case was purportedly filed two days before this lawsuit, there are reasons to question the accuracy of that filing date given the appearance of corruption in the Ethiopian case and the lack of any reliable verification of that purported filing date. *See supra* note 17.

[23] At trial, the Court deferred ruling on whether the Ethiopian judgments would be admitted into evidence. Having found that the judgments are not entitled to recognition, the Court will not admit the Ethiopian judgments into evidence as they are irrelevant.

this case – to transfer title to the property." This is an *in personam* case regarding an alleged breach of the contract, not an *in rem* dispute over ownership of the property, and the Court has previously determined that it has jurisdiction to decide the breach of contract claims. Further, Plaintiff Mulugeta has full control over Salit Academy PLC's actions, and it appears unlikely from the facts of this case that she would ultimately refuse to transfer title to the property from Salit Academy PLC to Defendant Ademachew. To the contrary, Mulugeta has consistently maintained that she is ready, able, and willing to provide Ademachew with the dissolution papers and fulfill her remaining contractual obligations as soon as she has assurance that Ademachew will pay her the money promised. Regardless, the Court can fashion a remedy that will protect Defendant Ademachew in the event Plaintiff Mulugeta refuses to transfer title and can enforce the contract through subsequent breach of contract claims or use of its contempt power if the need arises. The Court therefore reaffirms that it has jurisdiction to consider the breach of contract claims.

## C.   Virginia Law Applies in this Lawsuit.

The parties dispute whether the contract is governed by Virginia or Ethiopian law. Even if the contract is governed by Ethiopian law, the Court will apply Virginia law in analyzing the contract for two reasons.

First, Ademachew has not demonstrated a clear conflict between Ethiopian contract law and Virginia contract law. A "choice of law analysis becomes necessary only if the relevant laws of the different states [or countries] lead to different outcomes." *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013) (quoting *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750 (D. Md. 2003)) (alterations in original omitted); *see also World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 514–15 (4th

Cir. 2015) (collecting cases holding similarly). "[W]here the laws 'do not so conflict, the choice is immaterial, and the law of the forum—[Virginia]—governs.'" *Perini/Tompkins*, 738 F.3d at 101 (quoting *Lowry's Reports*, 271 F. Supp. 2d at 750).

Ademachew has repeatedly referred to and relied upon Virginia's contract law throughout this litigation. Indeed, Ademachew concedes in his pre-trial brief that neither party has "identified any differences between the law of Ethiopia and the law of Virginia with respect to certain fundamental principles of contract law." Dkt. 72 at 12 n.4. While Ademachew argues that Ethiopian law has "unique requirements" for the transfer of real property, *id.*, as previously discussed, the contract at issue does not itself transfer real property, but rather is an agreement to transfer the property. Ademachew also admits that "Virginia contract law leads down a different path but ends with the same result" as Ethiopian contract law. *Id.* at 15. As Ademachew has not demonstrated that Ethiopian law would lead to a different outcome, Virginia law governs the Court's analysis of the contract. *Perini/Tompkins*, 738 F.3d at 101.

Second, and perhaps more importantly, Ademachew has failed to prove the contents of Ethiopian contract law as required by Federal Rule of Civil Procedure 44.1, which governs determinations of foreign law in federal court. Rule 44.1 states:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1. Although "Rule 44.1 provides courts with broad authority to conduct their own independent research to determine foreign law," it "imposes no duty upon them to do so." *Baker v. Booz Allen Hamilton, Inc.*, 358 F. App'x 476, 481 (4th Cir. Dec. 28, 2009) (citing *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 205 (1st Cir. 1988)). "Thus, the party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action

and the burden of proving foreign law to enable the district court to apply it in a particular case." *Id.* (citing *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir. 1996)). "Where a party fails to satisfy either burden, the district court should apply the forum state's law." *Id.*

Ademachew has submitted only unreliable documents to prove the content of Ethiopian law: (1) the Ethiopian judgments in his case against Salit Academy PLC, which the Court has already determined should not be recognized, and (2) a letter he personally obtained from the Federal Attorney General Federal Documents Authentication and Registration Agency about the "preconditions that should be fulfilled" "in order to transfer names" to the property (the "Agency Letter"), which is unreliable hearsay requested by the proponent. Critically, Ademachew has not provided the Court with translated copies of the relevant provisions of Ethiopia's civil code for the Court to review and compare against the Ethiopian judgments or the Agency Letter. Nor has Ademachew provided an expert who could explain Ethiopian contract law to the Court and answer any questions the Court may have. Finally, both the Ethiopian judgments and the Agency Letter focus on the formalities required to transfer title to a property, which are irrelevant to the issues before the Court, not the relevant Ethiopian law regarding contracts. In the eloquent words of the Fifth Circuit:

> It was the [defendant's] burden to provide the legal pigment and then paint the district court a clear portrait of the relevant [Ethiopian] law. The [defendant] failed to provide a pallet, a painter with a usable brush, and paint possessing distinct visibility. The resultant picture contains neither abstract nor realistic exposition. Given this state of the art, the district court [is] well within its discretionary realm to refuse to accept this virtually barren canvas when it was within the [defendant's] power to present a canvas upon which it had etched a clear and visible statement of the applicable [Ethiopian] law.

*Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1007 (5th Cir. 1990). Therefore, as Ademachew has not satisfied his burden of establishing the content of Ethiopian contract law, the Court must apply the law of Virginia. *Baker*, 358 F. App'x at 481; *see also*

*Indura S.A. v. Engineered Controls Int'l Inc.*, 2011 WL 3862083, at \*27 (M.D.N.C. Sept. 1, 2011) (declining to rely on Chilean law for breach of warranty causes of action because the Court had not been provided with "the translated text of the applicable Chilean statutes or case law").

**D.      Mulugeta Is Entitled to Judgment on Her Breach of Contract Claim.**

Plaintiff Mulugeta's Amended Complaint contains one count for breach of contract, which alleges that Defendant Ademachew breached the contract "by failing to render the sums due and owing under the terms of the Contract at the time that they were due." Am. Compl. ¶ 45. The Court finds that Mulugeta has standing to bring this claim and that she is entitled to relief.

    *i.      Mulugeta Has Standing to Bring the Breach of Contract Claim Because She Is a Third-Party Beneficiary to the Contract.*

Although Plaintiff Mulugeta is not a party to the contract at issue, she has standing to bring her breach of contract claim as a third-party beneficiary.

It is well established in Virginia that "a party may sue to enforce the terms of a contract even though [s]he is not a party to the contract" where the third party "show[s] that the contracting parties clearly and definitely intended that the contract confer a benefit upon [her]." *Envtl. Staffing Acquisition Corp. v. B&R Constr. Mgmt., Inc.*, 283 Va. 787, 792–93, 725 S.E.2d 550, 553–54 (2012) (first quoting *Levine v. Selective Ins. Co. of Am.*, 250 Va. 282, 285, 462 S.E.2d 81, 83 (1995); and then quoting *Collins v. First Union Nat'l Bank*, 272 Va. 744, 751, 636 S.E.2d 442, 446–47 (2006)); *accord Caudill v. Cty. of Dinwiddie*, 259 Va. 785, 793, 529 S.E.2d 313, 317 (2000) ("We have enforced a third-party beneficiary's claim when the third party establishes that the parties to the underlying contract clearly and definitely intended to confer a benefit upon the alleged beneficiary."). "To determine whether the original parties intended to benefit a third party, Virginia courts look to the plain language of the contract." *Coonley v. Wells*

*Fargo Bank, Nat'l Ass'n*, 2018 WL 6787941, at *2 (E.D. Va. Dec. 26, 2018) (citing *Envtl. Staffing Acquisition Corp.*, 283 Va. at 794, 725 S.E.2d at 554).

The plain language of the contract clearly demonstrates that the parties to the contract – Ademachew and Salit Academy PLC, through Mulugeta – intended Plaintiff Mulugeta to directly benefit from the contract. The contract provides that each of Ademachew's payments "should be deposited in Ms. Lulit Mulugeta['s] name at her account in America." Contract ¶ 4.1. If the parties had intended for the money to benefit Salit Academy PLC rather than Mulugeta, they would have required that the funds be payable to Salit Academy PLC, not be deposited in Mulugeta's name at her bank account in America. Furthermore, as part of the agreement to sell the property to Ademachew, the contract also specifies that the parties had agreed to dissolve Salit Academy PLC. As a dissolved corporation would have no use for the purchase price, the agreement to dissolve Salit Academy PLC is further evidence that Mulugeta was the intended direct beneficiary of the purchase price. Thus, the plain language of the contract makes clear that Mulugeta is a third-party beneficiary.

Indeed, Ademachew cannot in good faith argue otherwise. Ademachew has himself referred to the contract as between himself and Mulugeta, and that makes sense as Mulugeta has one hundred percent control over Salit Academy PLC's actions[24] and her role in Salit Academy's operations was minimal to say the least. Moreover, the uncontroverted testimony at trial established that Ademachew and Mulugeta (on behalf of Salit Academy) formed the contract specifically to give Mulugeta enough money to start a business in the United States since she was afraid to return to Ethiopia and the school, which had been established solely to provide Mulugeta with income and employment in Ethiopia, was not profitable.

---

[24] Mulugeta and her mother are Salit Academy's sole shareholders, and Mulugeta's mother provided Mulugeta with power of attorney to act on her behalf in matters concerning Salit Academy PLC.

Thus, there is no doubt that Mulugeta is an intended third-party beneficiary of the contract and has standing to enforce the contract against Ademachew.

ii.   *Ademachew Breached the Contract.*

There are three elements to a breach of contract action: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation." *Va. Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 655 (4th Cir. 2017) (quoting *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 784 S.E.2d 296, 299 (2016)).

There is no remaining dispute that the contract is valid and binding. Ademachew's arguments against the existence of a valid and binding contract all rested on the Ethiopian judgments, which the Court has found are not entitled to recognition. Further, the contract at issue is valid and binding because there was an offer and acceptance, a meeting of the minds as to the purpose of the contract, valid and substantial consideration on both sides, a written agreement signed before witnesses, substantial performance by both parties, and no argument has been raised that the contract was unconscionable. *See Irving v. PAE Gov't Servs., Inc.*, 249 F. Supp. 3d 826, 837 (E.D. Va. 2017) (summarizing that under Virginia law, "[a] contract is legally enforceable only when an offer is accepted and valuable consideration exchanged"). Indeed, "partial performance had gone so far" in this case "that should either party have tried to renege on the contract, it would have been enforceable by a suit for specific performance." *Cont'l Ins. Co. v. Brown*, 630 F. Supp. 302, 305 (W.D. Va. 1986).

Mulugeta has also clearly established that Ademachew breached the obligations he owed her and Salit Academy PLC under the contract, as Ademachew failed to pay any of the payment installments as specified by the contract. First, Ademachew did not pay the first half of the first

installment by the date specified in the contract, and never paid $45 of the first installment. Second, Ademachew failed to pay the second payment installment at all. The contract did not condition Ademachew's obligations to pay either of these payment installments on any actions by Mulugeta, but rather tied Ademachew's obligations to determinate dates and determinate amounts. As Ademachew failed to make these payments in full by the due dates specified in the contract, Mulugeta has established a material breach of the contract by Ademachew.

Ademachew has appeared to argue that his failure to comply with the payment provisions of the contract is excusable because Mulugeta failed to provide him with certain tax documents and the dissolution form. Yet, Ademachew assumed the obligation to complete the requisite tax documents and pay all costs, including taxes, in the contract, Contract ¶¶ 3.3, 5.1, 5.2, and has always completed tax forms for the school without Mulugeta's involvement. Further, as previously noted, the contract does not condition Ademachew's payment of either of these installments on receipt of the dissolution papers.[25] As such, Ademachew's failure to pay the first and second payment installments as required were unexcused breaches of the contract.

Mulugeta has also established that she was damaged because she did not receive the full payments owed to her under the contract. Ademachew has argued that Mulugeta has not been damaged because the Ethiopian courts have ordered Ademachew to return the property to Mulugeta and the property is worth more than the contract price. However, Mulugeta has established that she no longer desires to own the school and would be unable to sell the school on her own. Moreover, Mulugeta is entitled to the purchase price for the school that she was

---

[25] To the contrary, the contract did not obligate Mulugeta, on behalf of Salit Academy PLC, to even obtain the dissolution papers until well after the second payment was due. *See* Contract ¶ 3.1 (specifying that the dissolution papers must be obtained within 180 days after the contract was signed, i.e., by January 31, 2016).

promised under the contract and has been damaged by Ademachew's failure to provide her those contracted-for benefits.

Mulugeta has therefore clearly proven each of the elements of her breach of contract claim and is entitled to judgment as a matter of law. The Court will address the appropriate relief for Ademachew's breach of the contract in Part IV below.

### E.     Mulugeta Is Entitled to Judgment on Each of Ademachew's Counterclaims.

Defendant Ademachew's Counterclaim contains four counts. In Count I, Ademachew argues Mulugeta, as Salit Academy PLC's agent, has breached the contract by first failing to transfer title to the property to Ademachew and then by failing to return the purchase funds Ademachew has already provided to her as required by the Ethiopian judgments. Countercl. ¶¶ 14–21. For similar reasons, Ademachew asserts in Count II that Mulugeta has been unjustly enriched by the $435,000 in payments Ademachew has made pursuant to the contract while Mulugeta's wholly-controlled company, Salit Academy PLC, retains title to the school. *Id.* at ¶¶ 22–27. In Count III, Ademachew asserts that "Mulugeta is the recipient of a fraudulent conveyance of $435,000 that rightfully should be paid to Mr. Ademachew to satisfy Mr. Ademachew's judgment against Ms. Mulugeta's company, Salit Academy, PLC." *Id.* at ¶ 33. Finally, Count IV alleges that Mulugeta is liable for the $435,000 as the alter ego of Salit Academy PLC. *Id.* at ¶¶ 34–39.

As a threshold matter, each of Ademachew's counterclaims are premised on the argument that Ademachew is owed the $435,000 he has already paid to Mulugeta under the Ethiopian judgments, despite his repeated assertions that he is not asking this Court to enforce the Ethiopian judgments. For the reasons stated above, the Ethiopian judgments are not entitled to recognition and the Court will not recognize or enforce them. The Court will therefore consider

the merits of each of Ademachew's counterclaims without considering the judgments Ademachew obtained in Ethiopia against Salit Academy PLC.

First, the Court finds that Mulugeta is not liable for breach of contract. "'[A] party who commits the first breach of contract,' if material, 'is not entitled to enforce the contract' and thereby excuses the nonbreaching party from performance.'" *Va. Elec.*, 850 F.3d at 655 (quoting *Horton v. Horton*, 254 Va. 111, 487 S.E.2d 200, 203–04 (1997)) (alteration in original). "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Id.* (quoting *Horton*, 487 S.E.2d at 204).

Ademachew failed to make the second required payment and has been adamant that he will not make any further payments until Mulugeta provides him with the original dissolution papers. Ademachew's obligation to make the second payment was not conditioned on his receipt of the dissolution papers. Indeed, his obligation to make the second payment arose before Mulugeta was contractually obligated to even obtain the dissolution papers.[26] The parties have also represented that the dissolution papers are all that Ademachew needs to effectuate the transfer of title. Thus, if Mulugeta were to provide Ademachew with the originals of those papers before being paid in full as required by the contract, she would effectively transfer title to the school without being paid the consideration she is due under the contract. Ademachew's failure to timely pay his consideration under the contract therefore defeats the essential purpose of the contract and constituted the first breach of the contract. *See, e.g., Llewellyn v. Moyer*, 59 Va. Cir. 141 (2002) (holding that the buyer of real property committed the first material breach of the

---

[26] The contract obligated Ademachew to make the second payment on October 25, 2015. Contract ¶ 4.2. By contrast, Mulugeta was not required to obtain the dissolution papers for Salit Academy until January 31, 2016 (180 days after the contract was signed). *Id.* ¶ 3.1.

contract when he failed to timely pay part of the purchase price as required by the parties' contract). As a result, Ademachew is not entitled to enforce the contract and Mulugeta was legally excused from any subsequent performance. *Va. Elec.*, 850 F.3d at 655. Mulugeta is therefore not liable for breach of contract.

Mulugeta is also not liable for unjust enrichment. "Virginia law is clear that a plaintiff cannot raise an unjust enrichment claim where an express contract governs the alleged wrongdoing." *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 781 (E.D. Va. 2012). As there is an express contract governing the alleged breach asserted in the unjust enrichment claim, Ademachew's unjust enrichment claim must fail. Moreover, for the reasons expressed at length above, Ademachew has failed to show that it is inequitable for Mulugeta to retain the roughly $435,000 paid to her pursuant to the express contract after Ademachew's initial breach while she awaits the wrongfully withheld remainder of the purchase price before transferring title. *See Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 576 (E.D. Va. 2004) (noting that to prevail on an unjust enrichment claim, the plaintiff must show "acceptance or retention of [a] benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value").

Ademachew has also failed to prove the elements of a valid fraudulent conveyance claim. Under Virginia law, to prevail on his fraudulent conveyance claim, Ademachew must have proven that "(1) a transfer was made, (2) the transfer was not supported by consideration deemed valuable in law, and (3) the transfer was done when the transferor was insolvent or the transfer rendered the transferor insolvent." *In re Meyer*, 244 F.3d 352, 353 (4th Cir. 2001). Ademachew's fraudulent conveyance claim is premised on his status as a judgment-creditor under the Ethiopian

judgments. As the Court has declined to recognize the Ethiopian judgments, Ademachew's fraudulent conveyance claim must also fail. Additionally, Ademachew has failed to establish even the first element of his fraudulent conveyance claim: that the roughly $435,000 was transferred from Salit Academy PLC to Mulugeta. The record clearly establishes that no transfer was made from Salit Academy PLC to Mulugeta, but rather that Ademachew paid the roughly $435,000 directly to Mulugeta personally as required by the contract. Mulugeta is therefore entitled to judgment on Ademachew's fraudulent conveyance claim.

Finally, Mulugeta is also entitled to judgment on Ademachew's alter ego liability claim. "The Supreme Court of Virginia has specifically held . . . that proof that some person 'may dominate or control' [a] corporation, or 'may treat it as a mere department, instrumentality, agency, etc.' is not enough to pierce the [corporate] veil" and establish alter ego liability. *Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545, 548 (4th Cir. 1992) (quoting *Beale v. Kappa Alpha Order*, 192 Va. 382, 64 S.E.2d 789, 798 (1951)). Instead, to prevail on an alter ego liability claim in Virginia, the party bringing the claim "must also establish 'that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime.'" *Id.* (quoting *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 360 S.E.2d 828, 831 (1987)). In other words, "Virginia adheres to a rigorous standard requiring proof that the defendant used the corporation to 'disguise' some legal 'wrong.'" *Id.* Ademachew has not provided any evidence that Mulugeta used Salit Academy PLC to "disguise some legal wrong." As a result, Ademachew's alter ego liability claim necessarily fails.

In conclusion, Mulugeta is entitled to judgment on each of Ademachew's counterclaims.

.

## IV. RELIEF

Mulugeta is entitled to specific performance on the contract to remedy Ademachew's breach and place her in the position she would have been in had Ademachew not breached. *See Ndeh v. Midtown Alexandria, L.L.C.*, 300 F. App'x 203, 207–08 (4th Cir. 2008) (collecting cases holding that under Virginia law, "specific performance is the preferred remedy for breach of a contract to convey real property"). Mulugeta is therefore entitled to the $565,045.00 Ademachew has failed to pay her.[27]

Mulugeta has also requested an award of prejudgment interest on that sum. "Virginia law governs the award of prejudgment interest in a diversity case." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999). Virginia Code § 8.01-382 provides that the Court "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Va. Code Ann. § 8.01-382 (West 2010). "Whether prejudgment interest should be awarded under § 8.01-382 is a matter within the sound discretion of the district court." *Hitachi*, 166 F.3d at 633. "The purpose of awarding pre-judgment interest is to compensate the prevailing party for the loss of use of its funds." *In re Potomac Supply Corp*, 2016 WL 675545, at *6 (E.D. Va. Feb. 18, 2016) (citing *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 196 (1995)). Mulugeta was entitled to each installment of the purchase price by the dates specified in the contract, and the Court finds it appropriate to award interest on the unpaid installments from the dates those payments became overdue. *See id.* at *6 (awarding prejudgment interest from the latest closing date allowed under the breached Asset Purchase Agreement); *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 823 F.

---

[27] This sum is composed of the $45 Ademachew failed to pay of the first payment installment, the $217,500 Ademachew failed to pay of the second payment installment, and the $347,500 Ademachew failed to pay of the third payment installment.

Supp. 2d 364 (E.D. Va. 2011) (awarding prejudgment interest from the date the insurer breached the insurance contract by improperly denying coverage). By statute, prejudgment interest shall accrue at a rate of six percent per annum. Va. Code. Ann. § 6.2-302 (West 2010).

"Federal law, rather than state law, governs the calculation of post-judgment interest in diversity cases." *Hitachi*, 166 F.3d at 633. Under federal law, post-judgment interest "shall be allowed" and "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a) (West 2000).

In accordance with the rulings made above, the Court will therefore grant relief in the following manner:

1. Defendant Ademachew will be ordered to place the following sums in an escrow account in Virginia for Plaintiff Mulugeta:[28]

    a. $45.00 plus prejudgment interest of six percent per annum accruing from September 15, 2015, and post-judgment interest calculated pursuant to 28 U.S.C. § 1961(a) accruing from the date of the Court's judgment until the date the sum is placed in escrow; and

    b. $217,500.00 plus prejudgment interest of six percent per annum accruing from October 25, 2015, and post-judgment interest calculated pursuant to 28 U.S.C. § 1961(a) accruing from the date of the Court's judgment until the date the sum is placed in escrow; and

---

[28] Lest there be any confusion, these funds shall be payable to Ms. Lulit Mulugeta directly, not Salit Academy PLC, and shall be made in United States dollars.

c. $347,500.00 plus prejudgment interest of six percent per annum accruing from January 29, 2016,[29] and post-judgment interest calculated pursuant to 28 U.S.C. § 1961(a) accruing from the date of the Court's judgment until the date the sum is placed in escrow.

2. Within sixty days of Defendant Ademachew properly placing the required sums in escrow and notifying Plaintiff Mulugeta that he has done so, whichever is later, Plaintiff Mulugeta, on behalf of Salit Academy PLC, will be ordered to provide Defendant Ademachew with the original dissolution papers for Salit Academy PLC and, if necessary, sign the deed transfer document at DARO to effectuate the transfer of title to the property at issue.

3. Once Plaintiff Mulugeta has transferred title to the property to Defendant Ademachew, the funds placed in escrow will be released to Plaintiff Mulugeta.

At trial, Mulugeta also orally moved for attorneys' fees under Va. Code. Ann. § 8.01-271.1 and *Kambis v. Considine*, 290 Va. 460, 778 S.E.2d 117 (2015). "Like other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980). Ademachew has not had a sufficient opportunity to respond to Mulugeta's allegations that he should be sanctioned for all of Mulugeta's attorneys' fees. Mulugeta has also not fully explained or supported her requested sanction beyond a brief argument during closing arguments at trial. As a result, the Court declines to sanction Ademachew at this time. If Mulugeta continues to desire sanctions in the form of attorneys' fees, Mulugeta may file a motion for such in accordance with Federal Rule of Civil Procedure 54(d)(2).

---

[29] Under paragraph 4.3 of the contract, January 29, 2016 (sixty days after November 30, 2015) appears to be the latest date on which the final payment would have been made had there been no breach.

## V. CONCLUSION

For the reasons stated above and for good cause shown at trial, the Court finds in favor of Plaintiff Lulit Mulugeta and against Defendant Samuel Tafesse Ademachew on all claims and counterclaims in this case and will award Mulugeta relief in the manner described above in Part IV. An appropriate Order shall issue.

August ___ 2019
Alexandria, Virginia

Liam O'Grady
United States District Judge